IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK TREADWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 C 3179 |
| | ) | |
| OFFICER DAVID SALGADO #16347, | ) | Judge Virginia M. Kendall |
| OFFICER XAVIER ELIZONDO #1340, | ) | |
| and CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Mark Treadwell filed a civil-rights action against Chicago Police Officers David Salgado and Xavier Elizondo (the "Defendant Officers") and the City of Chicago stemming from the search of his home and his arrest in October 2017. (Dkt. 1, dkt. 99). Treadwell brings claims under 42 U.S.C. § 1983 against the Defendant Officers for illegal search and seizure; unlawful pretrial detention; violation of Due Process; failure to intervene; conspiracy to deprive Plaintiff of his constitutional rights; and supervisory liability as to Defendant Elizondo. (Dkt. 99 ¶¶ 70–113 (pleading Counts I–VII)). Treadwell has also sued the City, alleging that its police department's policies and practices render it liable for the underlying constitutional violations in this case pursuant to *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978). (*Id.*; *see also id.* ¶¶ 43–69). He also brings state-law claims against the Defendant Officers for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. (*Id.* ¶¶ 114–127 (pleading Counts VIII–X)). Finally, he brings claims under Illinois law against the City for respondeat superior and indemnification. (*Id.* ¶¶ 128–134 (pleading Counts XI–XII)).

The Defendant Officers now move for summary judgment on all claims. (Dkt. 246). The City joins the Defendant Officers' Motion[1] as to the respondeat superior and indemnification claims. (Dkt. 247). For the following reasons, Defendants' Motion [246] is granted in part and denied in part.

## BACKGROUND

### A.    The Informant

Defendants Xavier Elizondo and David Salgado are former Chicago police officers. (Dkt. 264 ¶ 2). In October 2017, they were members of a gang enforcement team operating in central Chicago, and Elizondo was team supervisor and sergeant. (Dkt. 264 ¶ 3).

Elizondo met Antwan Davis when he searched Davis's home in October 2017. (Dkt. 264 ¶ 8; dkt. 276 ¶ 15).[2] Elizondo found nothing illegal, but he gave Davis a phone number and suggested Davis could make money by providing information about houses where drugs were sold. (Dkt. 243-2 at 1411:20–1412:19). Davis took the number and called it, because he "had some information for [Elizondo]," and "wanted to get some money from him." (Dkt. 243-2 at 1412:20–1413:9). Davis first gave Elizondo information that someone named "Bay Bay Bay" was selling drugs from a house on 12th and Keeler. (Dkt. 243-2 at 1414:24–1415:20; *id.* at 1416:13–15). Elizondo picked Davis up, took him to the residence where "Bay Bay Bay" was supposed to be

---

[1] This Court previously granted the City's Motion to bifurcate and stay discovery and trial on the *Monell* claims. (Dkt. 222). Those claims are not included in this Motion.

[2] Plaintiff objects generally to Defendants' use of Antwan Davis's testimony at the Defendant Officers' criminal trial in their Local Rule 56.1 Statement of Facts, stating that it is inadmissible former testimony under Federal Rule of Evidence 804(b)(1). Federal Rule of Civil Procedure 56(c)(1)(A) requires parties asserting a fact must support this assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other material." The opposing party can object that a fact is not supported by admissible evidence. Rule 56(c)(2). But the objection is to *form*—"a party may object that the material cited to support or dispute a fact *cannot be presented in a form* that would be admissible in evidence." Rule 56(c)(2) (emphasis added). Here, Plaintiff objects that Davis's testimony cannot support a factual assertion at summary judgment because it cannot meet the strictures of FRE 804(b)(1), but the objection is misplaced. Davis was apparently not deposed for this civil action, and he has not been cross-examined by Treadwell or his predecessor in interest. But FRE 804(b)(1) is not relevant at this time, because nothing shows Davis is or will be unavailable to testify in the future. His testimony here relates to the same events. The underlying facts would be admissible in a future trial, as Davis can be called to testify. The Court also notes Plaintiff extensively cites witnesses' trial testimony—including Davis's—in his own Local Rule 56.1 Statement to establish facts in the record. (*See* dkt. 267 ¶¶ 10–18, 20–21, 23–25, 30–32).

selling, and gave him $20 to use to purchase PCP from the location, which he did. (Dkt. 243-2 at 1416:18–1421:22). Salgado then sought a search warrant for the residence, but Davis did not appear before a judge to swear that he provided the information in the warrant. (Dkt. 243-2 at 1423:19–1424:9). The "J. Doe" signature on the warrant complaint was not his. (*Id.*) Elizondo paid Davis $150 the day after executing the search warrant. (Dkt. 243-2 at 1427:4–11). Davis understood Elizondo paid him because "they went in the house and got an arrest, and they found stuff" based on his information. (Dkt. 243-2 at 1426:10–20).

Soon after, Davis told Elizondo that "Mark" was "selling out his house," and that he had two guns and some marijuana and ecstasy pills there. (Dkt. 243-2 at 1428:24–25, 1429:2–3). On October 21, 2017, Elizondo sent Davis a photograph of Mark Treadwell, whom Davis identified. (Dkt. 243-2 at 1428:7–8, 18–22; dkt. 264 ¶ 13). Davis and Treadwell lived in the same neighborhood and knew each other. (Dkt. 264 ¶ 14; dkt. 276 ¶ 25). They did not get along, because Davis—a middle-aged adult—had made an inappropriate pass at Treadwell's underage niece. (Dkt. 276 ¶ 26).

Treadwell asserts Davis had never been to Treadwell's house at 1645 S. Harding Street, and he had never sold drugs to Davis nor to anyone else out of the Harding residence. (Dkt. 243-8 at 140:8–16). Davis, for his part, said he knew Treadwell was a drug dealer because they were on the same block, and he had seen people go to that house to buy drugs before.[3] (Dkt. 243-2 at

---

[3] Defendants state Davis had "advised the officers that he had previously purchased drugs from Plaintiff in the past." (Dkt. 264 ¶ 15 (citing dkt. 243-2 at 1507:19–21)). But in context, the cited trial transcript shows Davis did not testify to this. Davis said: "I told [Elizondo] I knew a house that sold—that Mark Treadwell had a house that had guns in it and drugs in it," without specifying whether he had been there or how he knew this. (Dkt. 243-2 at 1506:18–19). When questioned at trial about his knowledge, Davis confirmed he thought Treadwell had drugs in his house because he knew or understood Treadwell was a drug dealer. (Dkt. 243-2 at 1507:12–18). But when asked, "And you don't know who Treadwell sold drugs to other than you?" Davis said, "No." (Dkt. 243-2 at 1507:19–21). The cross-examining attorney thus suggested Treadwell sold drugs to Davis. But Davis never affirmatively stated that he bought drugs from Treadwell, and no other portion of his trial testimony suggests as much. Nor did Davis testify that he ever told the officers he had personally purchased drugs from Treadwell or had ever been to the Harding residence. Defendants' assertion in their Rule 56.1 Statement at ¶ 15 is unsupported by the cited evidence.

1507:12–1508:3). Davis later made in-court identifications of Treadwell's house at 1645 S. Harding Street, but he did not say whether he had identified the house before the officers sought a search warrant.[4] (Dkt. 243-2 at 1429:10–17, 1430:15–16, 1431:9–12). Neither did he testify that he had been to the house to buy drugs, either that day or any other previous time. (*See generally* dkt. 243-2, dkt. 262-6 (Davis testimony at trial)). Davis never appeared before a judge to testify about his knowledge of Mark Treadwell or the Harding residence. (Dkt. 243-2 at 1431:9–12).

In the following weeks, Davis told Elizondo about several individuals who were allegedly selling drugs from their houses, and from this information, Elizondo sought search warrants for the respective residences. (Dkt. 264 ¶¶ 18–21). Davis received money and cigarettes from Elizondo and Salgado after searches. (Dkt. 276 ¶ 18; dkt. 262-6 at 1592:21–25). On Elizondo's instruction, Davis provided false information for certain search warrants, so that Elizondo could give that information to the judge who would authorize the warrants. (Dkt. 262-6 at 1439:2–1440:10). Davis also testified he would lie to judges because Elizondo and Salgado paid him to. (Dkt. 276 ¶ 22).

---

[4] The search warrant complaint recounts that Defendant Salgado met with an individual referred to as "J. Doe." (Dkt. 243-4 at 13). The search warrant reports that J. Doe "was also provided a picture of 1645 S Harding" and that "J. Doe positively identified the photo as being 1645 S. Harding, where 'Mark' resides in." (*Id.*) Defendants cite these statements in the warrant complaint as evidence to support their asserted fact that, "[p]rior to obtaining a search warrant, Davis identified a photograph of 1645 S. Harding with Defendant Officers, confirming it was the address he was describing as Plaintiff's home with the drugs and guns." (Dkt. 264 ¶ 16). But Davis did not testify in court that he made a prior identification of Treadwell's home to Salgado or Elizondo. (*See generally* dkt. 243-2; dkt. 262-6 (Davis's testimony at trial)). The search warrant also states that Salgado drove past 1645 S. Harding with J. Doe, and that J. Doe pointed to the location and indicate that was where "Mark" resided. (Dkt. 243-4 at 14). Davis never testified he drove past the Harding residence with Salgado and pointed it out to him, either. (*See* dkt. 243-2; dkt. 262-6). When presented with the Treadwell search warrant at trial, Davis only confirmed he had provided information about Mark Treadwell and 1645 South Harding. (Dkt. 243-2 at 1431:6–12). He also confirmed he neither appeared before the warrant-issuing judge, nor signed the search warrant. (Dkt. 243-2 at 1431:13–21). Davis neither adopted J. Doe's statements—as told by Salgado—in the warrant as his own, nor confirmed any prior identification of Treadwell's house in his trial testimony. (*See* dkt. 243-2; dkt. 262-6). Moreover, the statements contained in the search warrant as to J. Doe's identification of the residence to Salgado are inadmissible hearsay as they are offered for the truth of the matter asserted (that J. Doe/Davis pointed out Treadwell's house to the officers) and do not fall within any exceptions to the hearsay rule. Fed. R. Evid. 802, 803, 804. Plaintiffs have properly objected that this evidence of Davis's purported prior identification cannot be presented in a form admissible at trial. Fed. R. Civ. P. 56(c)(2).

**B.      The Search Warrant**

The Defendant Officers sought a search warrant for Mark Treadwell and 1645 S. Harding Street. (Dkt. 264 ¶ 48; dkt. 243-4 at 12)). The warrant complaint is written from Salgado's perspective and signed by Salgado but sets forth the statements of a "J. Doe" informant as the basis for the court's probable-cause determination.[5] (Dkt. 243-4 at 13–14). The warrant complaint recounts Salgado meeting on October 21, 2017, with a J. Doe confidential informant, who physically described "Mark" and identified his photo and his residence at 1645 S. Harding Street. (*Id.* at 13). The complaint relates J. Doe's statements that he had gone to the Harding residence that same day to purchase "Loud"—street terminology for pure sativa cannabis—from Mark. (*Id.* at 13–14). The complaint further states J. Doe had known Mark for about a month and had been buying "Loud" from Mark two to three times a week at his house during that time. (*Id.* at 14). Salgado related in the complaint that he drove past 1645 S. Harding with J. Doe, who identified it as Mark's residence. (*Id.* at 14). Salgado also attested to having learned Mark Treadwell is "a convicted felon for possession of cannabis 30-500 grams." (*Id.*)

Finally, the warrant application states: "J. Doe appeared in front of the presiding Judge and swore to the contents of the complaint and was made available for questions. . . . J. Doe's criminal history, including possible pending investigations, in any, has been presented and made available to the undersigned judge." (*Id.*) The warrant application says nothing of J. Doe's history of giving accurate information. It does not state J. Doe had been promised payment for information.

---

[5] Plaintiff objects to Defendants' citation of the statements attributed to J. Doe in the warrant application as inadmissible hearsay offered for the truth of the matter asserted and not within any exception to the hearsay rule. Fed. R. Evid. 802, 803, 804. They may be offered, however, for the limited non-hearsay purpose of evidence presented on the face of a warrant application to a judge for a probable-cause determination.

Assistant Cook County State's Attorney Katherine Siefert approved the warrant application before it was submitted to Cook County Judge Elizabeth Hayes. (Dkt. 264 ¶ 55). Judge Hayes signed the search warrant at 5:55 p.m. that same day, October 21, 2017. (*Id.* ¶ 56). Defendant Salgado swore to and signed the search warrant, and it was also signed "J. Doe." (Dkt. 276 ¶ 29; dkt. 243-4 at 14). The search warrant authorizes a search for "cannabis and any paraphernalia used for weighing, cutting, or packaging of illegal narcotics, any evidence showing residency, and any USC or any records detailing illegal narcotics transactions." (Dkt. 243-4 at 2). It does not mention ecstasy pills or guns. (*Id.*; dkt. 276 ¶ 38).

Treadwell denies he sold drugs to anyone that day and maintains he was refereeing a basketball game in Indiana most of the day. (Dkt. 276 ¶ 36). As far as Treadwell knew, no one sold drugs out of the Harding residence. (Dkt. 276 ¶ 37). Antwan Davis did not appear before the judge about this search warrant, and the J. Doe signature on the warrant is not his. (Dkt. 276 ¶ 30; dkt. 243-2 at 1431:3–21; dkt. 243-4 at 14). Davis's signature does not appear on the warrant, nor is he identified anywhere in it as "J. Doe." (Dkt. 243-4 at 12–14). Elizondo later paid Davis about $200 for the search of the Harding residence. (Dkt. 276 ¶ 32).

Salgado asserted his Fifth Amendment privilege when asked whether someone other than Antwan Davis was presented as a "dummy informant" to testify before the judge to secure the warrant. (Dkt. 276 ¶ 33). Both Defendant Officers pleaded the Fifth in response to all questions concerning probable cause to search Treadwell and his home, including the source and credibility of information relied on. (Dkt. 276 ¶ 85).

## C.     The Search of the Harding Residence

Treadwell lived part-time at the Harding residence and part-time at another house on Central Park Avenue, both properties owned by his father. (Dkt. 264 ¶ 33; dkt. 276 ¶ 42). In

addition to Treadwell, his sister Tameka Treadwell, nephew Doran Woods, uncle Mac Treadwell, and uncle Cardale Dorsey all stayed at the Harding residence. (Dkt. 276 ¶ 41). All family members took turns sleeping in the bedrooms and used the storage areas—including Treadwell—and no one had exclusive access to any specific bedroom. (Dkt. 264 ¶¶ 38–39, 42–43).

After Judge Hayes signed the warrant, Defendants and other non-defendant Chicago police officers executed the search warrant that same evening. (Dkt. 264 ¶ 57). Treadwell was home alone, and around 8:29 p.m., he went outside after hearing his dogs barking. (Dkt. 264 ¶ 72). He met the Defendant Officers who informed him of the search warrant, and Salgado handcuffed Treadwell to the property's fence. (Dkt. 264 ¶ 72). Elizondo led the team of officers that arrived at the Harding residence to execute the search warrant. (Dkt. 276 ¶ 44). The team also included Officers Roberto Ramirez, Jose Sanchez, Stefan Vidljinovic, Justin Homer, Eric Helson, and Milan Djordjevic, and Nebojsa Djurdjevic. (Dkt. 276 ¶¶ 44–45). Salgado did not immediately explain why he handcuffed Treadwell but asked if he had any enemies in the neighborhood. (Dkt. 276 ¶ 50).

Salgado also asked Treadwell if there was anything in the house that should not be there, and Treadwell said not to his knowledge. (Dkt. 243-8 at 156:21–157:1). In fact, shortly before the search, Treadwell had been smoking marijuana with his neighbor Billy Martin, who had brought "about an eighth" of marijuana to Treadwell's house. (Dkt. 264 ¶ 64). Treadwell knew Martin had left a bag of marijuana there, though he lied about this to Salgado. (Dkt. 264 ¶ 65; dkt. 243-8 at 157:8–15). Salgado then responded that someone in the neighborhood must not like him because they heard he had marijuana in his house. (Dkt. 243-8 at 157:17–23).

Elizondo and Salgado entered the residence before the other officers, and they were alone in the house for about five to seven minutes. (Dkt. 276 ¶ 55; dkt. 262-9 at 47:16–48:17). Salgado

uncuffed Treadwell after about thirty minutes and escorted him into the house so he could put his dogs away before re-handcuffing him inside the house. (Dkt. 264 ¶ 74). The officers then searched the house for about three hours while Treadwell was seated in the living room. (Dkt. 276 ¶ 59; dkt. 264 ¶ 75).

Salgado found two guns in a dresser drawer in the living room on the first floor. (Dkt. 264 ¶ 77; dkt. 243-23 at 93:19–94:24). Salgado showed them to Treadwell, who denied knowing anything about them. (Dkt. 264 ¶ 91). Officer Vidljinovic also recovered from the same dresser a knotted plastic bag he suspected contained cannabis, as well as a crushed powder substance he suspected to be ecstasy, and pills he suspected to be ecstasy and codeine. (Dkt. 243-23 at 98:19–23). Salgado also showed Treadwell the pills, and Treadwell said they were not his and he knew nothing about them. (Dkt. 243-8 at 163:8–18). Lab tests later confirmed the recovered substances as cannabis, codeine, and methamphetamine (ecstasy). (Dkt. 264 ¶¶ 82–84). Officer Ramirez recovered from "somewhere on the second floor" a bulletproof vest, some firearm rounds, and a magazine of ammunition. (Dkt. 243-26 at 173:12–20, 191:24–192:16). Elizondo recovered bottles suspected to contain liquid codeine, which later lab tests confirmed as to one bottle. (Dkt. 264 ¶¶ 86–87). Officers also found a scale with marijuana residue and a heat sealer. (Dkt. 264 ¶¶ 96–97).

Treadwell knew the marijuana was in the house when it was searched and admits he used his scale to weigh marijuana. (Dkt. 264 ¶¶ 65, 95, 97; dkt. 243-3 at 163:7–17). But he denies knowing the other illegal items were in the house when it was searched, though he had seen at least some of them before. (Dkt. 243-3 at 133:2–7; dkt. 243-8 at 204:4–6). Treadwell's nephew, Doran Woods, had brought the contraband into the house and showed it to him a week or so before the search, but Treadwell did not know they were still there. (Dkt. 243-3 at 133:2–7; dkt. 243-8 at 204:4–6; *id.* at 141:20–142:14, 142:18–24, 145:3–10). Woods had found the guns, bulletproof

8

vest, some pills, and ammunition in the trunk of a car he was repairing for someone named Demetrius. (Dkt. 243-8 at 228:2–8, 232:22–233:1, 233:10–11). Treadwell was angry Woods had brought contraband into the house and told him to get rid of it, and Woods agreed. (Dkt. 276 ¶¶ 53–54). Woods then stored the items in a closet on the second floor of the Harding residence. (Dkt. 264 ¶ 60).

Officers photographed Treadwell's personal identification and medication prescribed to him in the same drawer where the guns were also photographed. (Dkt. 243-3 at 153:112, 156:14–19; dkt. 264 ¶¶ 92). Treadwell disputes that the guns were initially located in the dresser drawer where they were photographed. (Dkt. 264 ¶ 89). Officers also found bills addressed to Treadwell at 1645 S. Harding Street during the search, though it is not clear where they were located. (Dkt. 264 ¶ 90). Treadwell disputes that the officers' photographs from the search show the items recovered in their proper or previous location, as Woods had stored the guns, ammunition, vest, and pills in a closet on the second floor. (Dkt. 264 ¶ 104; dkt. 243-8 at 235:19–236:13).

Treadwell was on probation for a conviction in DuPage County related to felony weapons charges, so he was forbidden from using illicit drugs and possessing a firearm or other dangerous weapon. (Dkt. 264 ¶ 69). He knew was not allowed to possess weapons under his probation terms and that possession of ecstasy was illegal. (Dkt. 264 ¶ 100). He also knew smoking marijuana could be a violation of his probation. (Dkt. 264 ¶ 101).

## D. Treadwell's Arrest

Treadwell was then arrested for and later charged with unlawful possession of firearms and a bulletproof vest by a felon, possession of marijuana, possession of ecstasy, and possession of other controlled substances. (Dkt. 264 ¶ 105). He says he was not read his Miranda rights at any

time, though Defendants dispute this. (*See* dkt. 243-3 at 145:15–16; dkt. 243-8 at 187:14–21; *but see* dkt. 243-15 at 3 (Arrest Report noting Treadwell was Mirandized)).

Treadwell disputes many of the statements Salgado wrote in the Arrest Report and contends they are fabricated. (Dkt. 276 ¶ 66; dkt. 243-4 at 5). Specifically, Treadwell says he never told Salgado, "I have two guns inside a dresser drawer while motioning with his head at a dresser drawer located in the dining room area." (Dkt. 243-4 at 5; dkt. 243-3 at 233:7–15; dkt. 243-8 at 186:19–187:10). He also denies telling officers that he owned guns for protection or sold pills so he could eat. (Dkt. 243-4 at 11; dkt. 243-8 at 187:25–188:19). The report also lists Officer Lisa Torres as an arresting officer, even though she was not present for either the search or the arrest. (Dkt. 276 ¶ 68).

A grand jury returned an indictment for the charges filed against Treadwell. (Dkt. 264 ¶ 107). While the charges were pending, he spent four months in jail and about three months on home confinement with electronic monitoring. (Dkt. 243-8 at 180:19–21). He could not work or go to school during that time. (Dkt. 276 ¶ 71). He experienced trauma and sexual violence while in the Cook County Jail. (Dkt. 276 ¶ 72).

## E.    Officers' Federal Criminal Charges

Salgado and Elizondo were indicted on federal charges on May 9, 2018. (Dkt. 276 ¶ 74; dkt. 264 ¶ 116). The superseding indictment alleged that Elizondo and Salgado:

> stole money; "knowingly (i) submitted materially false 'J. Doe' search warrant applications to Cook County judges; and (ii) caused individuals posing as 'J. Doe' confidential informants to provide false information to Cook County judges, in order to fraudulently obtain search warrants that would enable the defendants to enter and to seize property at various locations, and thereafter steal and otherwise misapply the property;" and destroyed evidence in an attempt to cover their tracks.

(Dkt. 276 ¶ 75). While the indictment referenced several J. Doe search warrants for various addresses, it did not identify the warrant for the Harding residence as a part of the conduct for which Elizondo and Salgado were indicted. (Dkt. 264 ¶ 117). Five days after Elizondo and Salgado were indicted, the Cook County State's Attorney's Office moved to dismiss the charges against Treadwell *nolle prosequi*. (Dkt. 264 ¶ 118; dkt. 276 ¶ 73). The CCSAO provided no specific reasons for deciding to drop the charges. (Dkt. 264 ¶ 119).

Antwan Davis testified at Elizondo's and Salgado's jury trial about several of the J. Doe warrants at issue in that criminal case. (Dkt. 264 ¶ 120). He also testified he provided information to Defendants about Mark Treadwell and the Harding residence but denied signing the warrant application or appearing before a judge on that warrant. (Dkt. 264 ¶ 11; dkt. 243-2 at 1431:9–21). The jury found Elizondo and Salgado guilty. (Dkt. 264 ¶ 124). Treadwell was identified as a trial witness by the government but was only called to testify at their sentencing. (Dkt. 264 ¶ 122; dkt. 276 ¶ 77).

Treadwell then sued Salgado and Elizondo individually and the City of Chicago on a *Monell* theory of liability for illegal search (Count I), illegal seizure (Count II), deprivation of liberty without probable cause (Count III), violation of due process under the Fourteenth Amendment (Count IV), failure to intervene to prevent violation of his constitutional rights (Count V), federal conspiracy to violate his constitutional rights (Count VI), and supervisory liability against Elizondo (Count VII). (Dkt. 99). He also brought state-law claims against the Defendant Officers for malicious prosecution (Count VIII), intentional infliction of emotional distress (Count IX), and civil conspiracy (Count X), as well as state-law claims against the City of Chicago for respondeat superior (Count XI) and indemnification (Count XII). (Dkt. 99). This Court granted the City of Chicago's motion to bifurcate and stay discovery and trial on Treadwell's *Monell* claims.

(Dkt. 222). Elizondo and Salgado now move for summary judgment on all claims. (Dkt. 246). The City joins the Defendant Officers' Motion as to the respondeat superior and indemnification claims under Illinois law. (Dkt. 247).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The Court takes the facts in the light most favorable to the non-moving party. *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). When a non-moving party specifically avers material facts that contradict those of the moving party, the Court must deny summary judgment. *Id.* at 996 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). The Court does not "resolve swearing contests or decide which party's facts are more likely true" at the summary judgment stage. *Id.* (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). The fact finder must resolve credibility disputes. *Id.* (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

## DISCUSSION

### A.    Federal Claims

#### 1.    Illegal Search

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. It guarantees that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." *Id.* Probable cause to search exists "when, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a

particular place." *United States v. Ochoa-Lopez*, 31 F.4th 1024, 1026–27 (7th Cir. 2022) (internal quotations omitted) (citing *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983))).

The same totality-of-the-circumstances test applies when probable cause depends primarily on a confidential informant. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable-cause determination's legitimacy then turns on the informant's credibility. *United States v. Orr*, 969 F.3d 732, 737 (7th Cir. 2020) (citing *United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005)). To assess the informant's credibility, the Court considers: "(1) the degree of police corroboration; (2) the informant's firsthand knowledge; (3) the detail provided; (4) the time between the reported events and the warrant application; and (5) whether the informant appeared before the judge." *United States v. Orr*, 969 F.3d 732, 737 (7th Cir. 2020) (citing *United States v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018)). The court "must afford great deference to the issuing judge's determination" that probable cause supports the warrant's issuance. *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009).

The warrant-issuing magistrate's probable-cause determination also assumes a *truthful* showing of the facts sworn to in the warrant affidavit. *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (internal quotations omitted). "The requirement that a warrant not issue 'but upon probable cause, supported by oath or affirmation,' would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause." *Id.* at 168; *see also Taylor v. Hughes*, 26 F.4th 419, 419 (7th Cir. 2022) ("Police officers owe judges candor when seeking warrants."). A warrant procured by lies or with reckless disregard for the truth is void. *Id.* at 427. The affiant officer for such a warrant faces § 1983 liability. *Id.* (citing *Supreme Video, Inc. v. Shauz*, 15 F.3d 1435, 1441 (7th Cir. 1985)). "To earn a trial on such a claim, a § 1983 plaintiff

13

must bring forth enough evidence to permit a reasonable jury to conclude that the defendant officer made intentional or reckless misrepresentations of fact that were necessary to the finding of probable cause." *Id.* (citing *Perlman v. City of Chicago*, 801 F.2d 262, 264–65 (7th Cir. 1986)).

Here, the Defendant Officers claim the search of the Harding residence was fully supported by probable cause, so summary judgment must be entered in their favor on Count I of Treadwell's complaint. They contend: (1) Antwan Davis—their confidential informant—provided enough information to establish probable cause when considered alongside Treadwell's criminal history, (dkt. 246 at 16–18); and (2) the warrant complaint contained sufficient reliable information to support probable cause, whether or not Davis appeared before the judge, (dkt. 246 at 19–21). In the alternative, the Defendant Officers assert qualified immunity as an affirmative defense. (Dkt. 246 at 21–22).

> (a) *Officers' Probable Cause to Seek Search Warrant Cannot Be Determined as a Matter of Law*

The Court finds that on this record, a reasonable jury could conclude the Defendant Officers did not have probable cause—under the totality of the circumstances—to search Treadwell and the Harding residence. Defendants' assertions to the contrary are based on misreading and misstatements of the record, particularly the trial testimony of Antwan Davis. According to Davis's testimony under oath at the Defendant Officers' criminal trial, he told Elizondo about "Mark" who was "selling out his house" and had two guns, marijuana, and ecstasy pills there. (Dkt. 243-2 at 1428:23–1429:5). Elizondo then sent Davis a photograph of Mark Treadwell, verifying they were talking about the same person. (*Id.* at 1428:18–22). He also confirmed he provided Elizondo information about where Mark Treadwell lived. (*Id.* at 1429:10–15; *id.* at 1431:6–12). Davis's testimony about Treadwell's activities and what he told Elizondo goes no further.

14

There is no evidence outside the disputed statements in the warrant complaint that Elizondo or Salgado independently corroborated Davis's story before seeking a search warrant that same day. *See Jacobs v. City of Chicago*, 215 F.3d 758, 768 & n.4 (7th Cir. 2000) ("[O]fficers seeking a search warrant relying on information provided by a confidential informant are under an obligation to take reasonable steps to confirm that information before using it in an affidavit in support of the warrant."). Davis never testified he went with either Salgado or Elizondo to 1645 S. Harding. He did not buy drugs there on Defendants' instruction as he did for the Keeler warrant where "Bay Bay Bay" was selling. Davis never even explained how he knew about these items or Treadwell's activities. He gave no details at all.

On this record, Davis's personal knowledge of Treadwell's alleged drug-dealing was limited to having seen people coming and going from the Harding residence to buy drugs. (Dkt. 243-2 at 1507:12–1508:3). Davis did not testify that he had been to Treadwell's house and seen the drugs or guns himself. It is at the very least disputed that Davis had ever bought drugs from Treadwell or been to his house at any point. (*See supra* note 4; *see also* dkt. 243-8 at 140:8–16 (Treadwell denying Davis had ever bought drugs from him or been to the Harding residence)). And the fact that officers *later* recovered two guns, marijuana, and ecstasy from Treadwell's house is irrelevant to the *initial* probable-cause determination. *See Taylor*, 26 F.4th at 429 ("Probable cause exists . . . [when] a reasonably prudent person would believe that contraband or evidence of a crime *will be found* in the place to be searched." (emphasis added) (quoting *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013)).

By contrast, Davis identified other warrants with fabricated stories that he—the J. Doe informant—had been to the residence in question that same day to buy drugs and gave detailed descriptions of the purchases, which were entirely falsified. (*See* Dkt. 262-6 at 1439:17–1440:10;

15

*id.* at 1445:25–1446:21). He admitted these purchases never happened, but he told these lies "[b]ecause [Elizondo] told me that's what we want to tell the judge." (Dkt. 262-6 at 1440:10). Though Davis was not questioned about the details provided in the Treadwell warrant specifically, Treadwell has testified under oath that they are falsified. (Dkt. 243-8 at 140:8–16). Both Defendant Officers exercised their Fifth Amendment privilege at their depositions when asked about their basis for believing Davis's tip about Treadwell. (Dkt. 276 ¶ 84).

A jury might permissibly infer the Defendant Officers had not investigated Davis's tip, despite knowing the informant had limited firsthand knowledge, and thus had little basis to believe his information. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 603 (7th Cir. 2019) ("When a defendant in a civil case invokes the Fifth Amendment, juries are permitted, but not required, to draw a negative inference against the defendant."). Davis's admission that Elizondo told him to lie about his firsthand knowledge of searches' targets is strong corroborative evidence to support the negative inference here. *See, e.g.*, *Cincinnati Ins. Co. v. Greene*, No. 10-cv-0370, 2012 WL 3202962, at *3 (S.D. Ind. Aug. 3, 2012) ("Before an adverse inference may be drawn, . . . there must be independent corroborative evidence to support the negative inference beyond the invocation of the [Fifth Amendment] privilege.").

Under all the circumstances here, a reasonable officer would have had good reason to doubt Davis's credibility. "[I]nformation about [an] informant's credibility or potential bias is crucial" to the probable-cause determination, and "officers must take care to assure themselves of the reliability of their informants." *Taylor*, 26 F.4th at 427 (quoting *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014)). True, Davis had provided accurate information on one prior search warrant days earlier. (Dkt. 243-2 at 1426:10–20). But the Defendant Officers also knew or should have known Davis was substantially motivated by the money Elizondo offered him in exchange

for tip-offs. *See Glover*, 755 F.3d at 817 (finding informant's expectation of payment both highly relevant and damaging to credibility). Davis also had a criminal history when he was recruited as an informant. *See id.* Elizondo had only recently met Davis after searching his house, so there was no long-standing history of reliability. *See Bell*, 585 F.3d at 1050 (finding relevant to reliability whether confidential informant had provided information to law enforcement in the past). And there is evidence Davis may have borne a grudge toward Treadwell. *See id.* (finding relevant to confidential informant's credibility whether he could have been "a rival drug dealer, an angry customer, or had some other beef with [the target]"). On this record, Defendant Officers did nothing to investigate Davis's relationship with Treadwell before immediately seeking a warrant.

Finally, the Defendant Officers argue Treadwell's "long, documented history of numerous arrests for both guns and drug offenses" was yet another relevant factor supporting probable cause to search his residence for evidence of similar conduct. (Dkt. 246 at 18). Defendants' citations of law supporting this proposition are dubious.[6] One (unpublished) case reveals the insufficiency of probable cause here: "Although a suspect's criminal history is a legitimate factor in a probable cause determination, it seems that *more corroborating information is required than the criminal record and a bare assertion of the suspect's guilt by an anonymous informant*." *Hardiman v. Ford*,

---

[6] *United States v. Schubert*, 528 F. App'x 613 (7th Cir. 2013) was not selected for publication in the Federal Reporter and thus not precedential. *See* Seventh Circuit Rule 32.1(b). Moreover, the court here only noted in passing, "The police report contained the facts establishing probable cause (with the exception of Schubert's prior felony conviction, which was detailed in the affidavit) and was attached to the affidavit." *Id.* at 618. The court did not discuss the extent to which a prior felony conviction weighs into the probable-cause analysis. In *Burton v. City of Zion*, the cited quotation reads in full, "An officer certainly is entitled to take what he knows about a suspect's history into account *in deciding on a reasonable amount of force*." 901 F.3d 772, 781 (7th Cir. 2018). The citation in context made no mention of probable cause, but rather concerned an officer's excessive use of force. The additional citations are to non-binding decisions of other courts. *People v. Hendricks*, 625 N.E.2d 304, 350 (Ill. App. Ct. 1993) (state-court case); *United States v. Murray*, No. 05 CR 650, 2007 WL 79249, at *9 (N.D. Ill. Jan. 5, 2007) (finding the arrest warrant's probable cause to believe defendant engaged in drug trafficking, plus defendant's criminal history, was "*sufficient to give rise to a reasonable apprehension that the defendant was likely to have weapons available in his home*" in context of public-safety exception to questioning prior to giving *Miranda* warnings); *Holifield v. Mitchell*, No. 14-cv-1486, 2018 WL 2447804, at *2–*3 (E.D. Wis. May 31, 2018) (district-court case) (describing extensive corroborative police work demonstrating probable cause to search, and mentioning at end of long discussion that defendant also "had an extensive arrest history, including numerous arrests related to drugs").

41 F.3d 1510 (Table), at *3 (7th Cir. 1994) (emphasis added). Indeed, this circuit's law is clear that "[a]lone, a record check [yielding criminal history] cannot serve to corroborate an informant's account." *United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005); *see also Glover*, 755 F.3d at 817 ("Being a convicted felon is not itself indicative of criminal activity.").

Defendants must have taken steps to corroborate Davis's account of Treadwell's activities beyond looking up his criminal record, as well as satisfied themselves as to Davis's credibility, to develop probable cause to search Treadwell's home. On this record, evidence of both falls short. A jury could conclude Defendant Officers displayed "reckless disregard for the truth" in relying on Davis's barebones accusation and thus lacked probable cause to seek the search warrant.

### (b) Misrepresentations and Omissions of Material Facts in Warrant Complaint Precluded Magistrate's Probable-Cause Determination

Even if Defendant Officers had reasonably believed Davis's account, they are not entitled to summary judgment. Treadwell has shown a reasonable jury could conclude they made intentional or reckless misrepresentations of facts necessary to the probable-cause determination. Namely, Antwan Davis—the purported confidential informant—did not appear before Judge Hayes, and he did not swear to the facts contained in the warrant complaint. (Dkt. 264 ¶ 11; dkt. 243-2 at 1431:9–21). This is undisputed, as is the warrant complaint's statement that: "J. Doe *appeared* in front of the presiding Judge and *swore to the contents of the complaint* and was *made available* for questions." (Dkt. 243-4 at 14). Salgado, in turn, swore to the truth of the facts in the affidavit, including J. Doe having sworn to the statements he provided. (*Id.*)

The record does not show where or under what circumstances Defendant Officers presented the warrant complaint to Judge Hayes. Nor does it show whether a J. Doe other than Davis appeared before Judge Hayes to be questioned. But the fact that Davis certainly did *not* appear before Judge Hayes strongly implies someone else *did*, given the warrant's statement to

18

that effect. And it is undisputed that someone other than Davis swore to the contents of the complaint by signing it "J. Doe." Davis, therefore, never swore to the facts contained in the warrant complaint—either before the judge or on the face of the warrant—for Judge Hayes's probable-cause determination. Defendants consistently maintain their J. Doe informant on Treadwell's warrant was Davis alone, not anyone else. So even if all other information contained in the warrant application were true—which is disputed—Defendant Officers knew their informant *had not* actually sworn to all the facts therein. He never swore to anything. *See Franks*, 438 U.S. at 165 (statements in the warrant affidavit must be "believed or appropriately accepted by the affiant as true"). For Defendant Officers to claim this technicality does not matter if other information in the warrant is true "reduce[s] to a nullity" the "requirement that a warrant not issue 'but upon probable cause, supported by Oath or affirmation.'" *See Franks*, 438 U.S. at 168.

Further, it is a reasonable and permissible inference that Defendants brought before Judge Hayes someone other than Davis, who parroted the story in the warrant complaint with no personal knowledge and hid that fact from the judge. Defendants exercised their Fifth Amendment privilege against self-incrimination when asked if they knowingly presented to Judge Hayes a "dummy informant" with no personal knowledge of the facts in the Treadwell warrant complaint. (Dkt. 276 ¶ 84). Defendants had no qualms telling Davis to lie about other warrants. (Dkt. 262-6 at 1440:9–10). They had also paid him to lie in front of judges. (Dkt. 276 ¶ 22). They were ultimately convicted of corrupt police conduct that included causing "individuals posing as 'J. Doe' confidential informants to provide false information to Cook County judges, in order to fraudulently obtain search warrants." (Dkt. 276 ¶ 75; Dkt. 264 ¶ 124). It is not a stretch to infer something similar happened here.

That a "dummy informant" appeared before Judge Hayes would certainly be a glaring omission of a material fact adverse to the informant's credibility. *Cf. Taylor*, 26 F.4th at 429 (finding defendant officer's omission of the fact he was guessing at target's address a "reckless misrepresentation" material to the judge's probable-cause determination, made in reliance of truthfulness of officer's representations). Whether or not Judge Hayes took the opportunity to question the informant before her, Defendant Officers undermined her ability to "determine independently whether there is probable cause" by knowingly or recklessly omitting the fact that the person before her had no personal knowledge of the warrant's contents. *Franks*, 438 U.S. at 165; *see also United States v. Glover*, 755 F.3d 811, 817 (7th Cir. 2014) (holding that omission of material information regarding confidential informant's credibility is "insurmountable" and "undermines the deference" given to a judge's probable-cause determination).

Even assuming neither Davis nor a "dummy informant" appeared before Judge Hayes at all and she approved the warrant on its face,[7] the warrant complaint contained few details supporting the informant's reliability and notably omitted other relevant, damaging facts material to the confidential informant's credibility, undermining Judge Hayes's probable-cause determination. *United States v. Bell* is instructive. 585 F.3d 1045 (7th Cir. 2009). In *Bell*, an informant gave an officer specific details about buying crack cocaine in an apartment, described the apartment's location, and said he had seen cocaine and a handgun on previous visits there. *Id.* at 1048. The informant also had a criminal history. *Id.* The warrant affidavit "relie[d] heavily" on the informant's detailed description of what he observed in the apartment earlier that day. *Id.* at

---

[7] Defendants argue there is no evidence anyone appeared before Judge Hayes, and speculate that "after the application was submitted, perhaps the judge determined that questioning Davis was unnecessary after reviewing the highly detailed warrant application. Perhaps the judge found that examining Defendant Salgado . . . about Davis's information was sufficient. Perhaps Davis ended up being unavailable at the time the judge was available to examine the warrant application and the judge issues the warrant on the application instead." (Dkt. 277 at 9–10).

1049–50. Nevertheless, the court found the affidavit failed to establish the informant's reliability. *Id.* The affidavit said nothing about whether the informant had given reliable information in the past. *Id.* There was no information about the informant's relationship with the target, and the informant did not appear before the judge. *Id.* Additionally, the court found officers did little to corroborate the informant's report, stating only that other "confidential sources" had implicated the same person in selling crack. *Id.* at 1050. The court found "[b]ased on the totality of the circumstances, including the veracity and bases of knowledge of the informants, the issuing judge did not have a substantial basis for finding that the affidavit established probable cause." *Id.* at 1051–52.

Here, the warrant similarly relies heavily on specific details about J. Doe's purchase of drugs from Mark Treadwell at the Harding residence on October 21, 2017. (Dkt. 243-3 at 13–14). But beyond the detailed description of this single purchase, the indicia of J. Doe's reliability fail in other respects. The warrant fails to state whether J. Doe had given officers reliable information in the past. (*Id.*) Little information was provided about J. Doe's relationship with Treadwell; he had just known him "for the past month" and purportedly been buying from him a few times per week in that time. (*Id.* at 14).

The only independent corroboration Salgado ostensibly conducted was driving past the residence with J. Doe, who pointed out the house. (*Id.*) The warrant does not describe any "controlled buy," nor does Salgado verify he saw any proof J. Doe had purchased marijuana that day. *See United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) ("Generally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity."). No information about Treadwell came from sources other than J. Doe. Besides driving past the house, the complaint gives no detail about how Salgado attempted to corroborate the report of Treadwell's

activities from an apparently untested, unverified confidential informant with no history of reliability. *See United States v. Searcy*, 664 F.3d 1119, 1123 (7th Cir. 2011) (finding probable cause despite limited details where affidavit showed informant had previously provided reliable information). The warrant furthermore vaguely alludes to J. Doe's "criminal history, including possible pending investigations, if any," without giving any details, stating only this information "has been presented and made available to the undersigned judge." (Dkt. 243-3 at 14). This criminal history would generally weigh against J. Doe's credibility. *See Glover*, 755 F.3d at 817.

Like the warrant in *Bell*, under the totality of the circumstances, there is insufficient information in the warrant complaint to show J. Doe's reliability beyond the detailed description of the drug purchase. While "a deficiency in one factor [for evaluating credibility] may be compensated for by a strong showing in another or by some other indication of reliability," all factors weigh in to the totality-of-the-circumstances analysis. *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006). Here, as in *Bell*, the warrant complaint's detailed description of J. Doe's recent drug purchase is outweighed by the lack of independent corroboration, lack of prior history of reliability, admitted prior criminal history, and scant details of J. Doe's relationship with Treadwell, in addition to his apparent failure to appear before the judge.

Moreover, the Defendant Officers undisputedly omitted another material fact highly relevant and damaging to their J. Doe informant's credibility. Judge Hayes had no opportunity to consider this was a *paid* informant. *See Glover*, 755 F.3d at 817 (noting that information about witness's expectation of payment is so critical to credibility as to require disclosure to defense as exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963) and analogously essential to magistrate's weighing confidential informant's credibility). Omitting such highly relevant information that undermines the informant's credibility—especially in a close case, without

extensive independent corroboration—deprived Judge Hayes of a "meaningful opportunity to exercise . . . her discretion to draw favorable or unfavorable inference" of Davis's information. *Glover*, 755 F.3d at 818.

There is thus little basis in the warrant for Judge Hayes to have established the J. Doe informant's reliability assuming no J. Doe appeared before her to answer any questions. Under that scenario, Judge Hayes's probable-cause determination necessarily relied on the single, detailed account of a drug purchase that day and general allegations of prior purchases. Treadwell has given evidence that this purchase never happened. He has also presented circumstantial evidence that permits reasonable inferences the Defendant Officers lied about Davis's testimony in their warrant complaint. Such evidence, if known while his criminal charges were pending, would have certainly entitled him to a *Franks* hearing on the truthfulness of the allegations in the warrant. *See Franks*, 438 U.S. at 171 ("There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons."). Without Davis's alleged drug purchase from Treadwell, no probable cause existed to search his home for marijuana and the warrant was void. *See Franks*, 438 at 171–72.

Furthermore, if a J. Doe other than Davis *did* appear before Judge Hayes and that person testified to the warrant's contents without personal knowledge, the Defendant Officers materially misled the judge in violation of *Franks* by omitting the crucial fact that they had actually received their information not from the person standing before her to answer questions, but from a different anonymous, paid informant of dubious credibility. Either way, the disputed facts preclude entering summary judgment in the Officers' favor on Treadwell's illegal-search claim (Count I). The jury

will need to weigh the disputed facts and determine whether the Defendant Officers had probable cause to search.

### (c) Officers Are Not Entitled to Qualified Immunity

The Defendant Officers argue they are entitled to qualified immunity because they had "an objectively reasonable basis for believing that the affidavit still demonstrated probable cause," even if they knowingly or recklessly submitted an affidavit containing false statements. *Archer v. Chisholm*, 870 F.3d 603, 615 (7th Cir. 2017). But officers who violate *Franks* and knowingly procure a warrant through misrepresentations or material omissions loses the shield of qualified immunity. *Taylor*, 26 F.4th at 430 ("An officer who procures a warrant in violation of *Franks* cannot conduct a search in good faith reliance on the validity of that warrant: inherent in a *Franks* violation is a finding that the officer knows—or at least reasonably should know—that the warrant *is not valid*."); *see also Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985) ("[I]n cases in which suppression would be warranted because an officer was dishonest or reckless in preparing a warrant affidavit, that officer would not enjoy good faith immunity for civil damages.").

Here, it is disputed whether Davis gave officers the detailed story in the warrant complaint, as well as whether the Defendant Officers had sufficient basis to believe any information Davis did provide. It is also disputed whether a "dummy informant" appeared before Judge Hayes to evaluate the informant's credibility. Treadwell has brought forward sufficient evidence to allow a reasonable jury to find the Defendant Officers lied about information material to the judge's probable-cause determination, in violation of *Franks*. Where there are such disputed facts, the Defendant Officers are not entitled to qualified immunity at summary judgment.

### 2. Illegal Seizure

The Fourth Amendment forbids unreasonable seizures of the person. U.S. CONST. amend. IV. A seizure for Fourth Amendment purposes is "an intentional limitation of a person's freedom of movement." *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) (internal quotations omitted). A seizure is unreasonable without probable cause. *Id.*; *see also Bailey v. United States*, 568 U.S. 186, 192 (2013) ("[T]he general rule [is] that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime."). But "[p]robable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *Muhammad v. Pearson*, 900 F.3d 898, 907–08 (7th Cir. 2018) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010)). Likewise, the Fourth Amendment prohibits unreasonable seizure both before and after legal process commences. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918 (2017). Probable cause is also a complete defense in this context. *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021).

"[P]robable cause is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Young*, 987 F.3d at 644 (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). The assessment is objective and based on what the arresting officer knew and the conclusions he might reasonably have drawn from that knowledge. *Id.* (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2008)). When there is room for a difference of opinion concerning the underlying facts or the reasonable inferences to be drawn from them, summary judgment is inappropriate, and a jury must decide whether probable cause to arrest existed. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008); *see also Qian v. Kautz*, 168

F.3d 949, 953 (7th Cir. 1999) ("While the existence of probable cause is often a jury question, summary judgment is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them."). Still, probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).

The exclusionary rule does not apply in the context of a civil suit under § 1983. *Martin v. Martinez*, 934 F.3d 594, 599 (7th Cir. 2019). An officer's prior violation of the Fourth Amendment does not invalidate probable cause he subsequently develops. *Id.*

Qualified immunity provides an "added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)) (internal quotations omitted). "[A]rguable probable cause" exists where "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) (citing *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014)).

Treadwell alleges false arrest (Count II) and unlawful pretrial detention (Count III). Defendant Officers contend they had probable cause to arrest and detain Treadwell at all relevant times. (Dkt. 246 at 22, 29–35). In the alternative, they claim qualified immunity. (Dkt. 246 at 35–37).

a)  *False Arrest*

Treadwell was arrested for unlawful possession of firearms and a bulletproof vest by a felon, possession of marijuana and ecstasy pills, and possession of other suspected drugs. (Dkt. 264 ¶ 105). Whether an arresting officer had probable cause depends on the elements of the underlying criminal offense, as defined by state law. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 715 (7th Cir. 2013). To prevail on his false-arrest claim, Treadwell must show that—under the totality of the circumstances—probable cause did not exist to arrest him for possession of the items recovered in the search, and that no reasonable officer could have believed it did.

Defendant Officers argue the undisputed facts here show that probable cause existed to believe Treadwell constructively possessed these items. "Constructive possession exists where there is no actual, personal, present dominion over the contraband, but defendant had knowledge of the presence of the contraband, and had control over the area where the contraband was found." *People v. Hunter*, 986 N.E.2d 1185, 1191 (Ill. 2013). "Proof that a defendant had control over the premises where the [contraband was] located . . . gives rise to an inference of knowledge and possession of the [contraband]." *People v. Givens*, 934 N.E.2d 470, 484 (Ill. 2010) (citing *People v. Adams*, 641 N.E.2d 514, 519 (Ill. 1994)). Illinois courts have held that living in the premises where the contraband is discovered "is sufficient evidence of control to constitute constructive possession." *People v. Cunningham*, 723 N.E.2d 778, 782 (Ill. 1999) (citing *People v. Valdez*, 621 N.E.2d 35, 38 (1993)). "Proof of residency in the form of rent receipts, utility bills and clothing in closets is relevant to show the defendant lived on the premises and therefore controlled them." *People v. Lawton*, 625 N.E.2d 348, 350 (Ill. 1993).

Even if the underlying search warrant was invalid for lack of probable cause, as an objective matter, the Defendant Officers developed probable cause to arrest Treadwell during the search. *See Martin*, 934 F.3d at 599 (exclusionary rule does not apply to § 1983 claims). Under all the circumstances, they had enough information when they arrested him to believe Treadwell had committed a crime. *See Young*, 987 F.3d at 644 (probable cause requires only probability of criminal activity). It is undisputed that several officers recovered drugs, drug paraphernalia, two guns, and body armor from various places in the Harding residence. They knew Treadwell had a felony conviction on his record, (dkt. 243-4 at 14), so he was not permitted to possess firearms. And they had enough information to believe Treadwell controlled the Harding residence. He was home alone when officers arrived. (Dkt. 264 ¶ 57). He let them into the house. (*Id.*) He put his dogs away in the house when the officers asked him to. (Dkt. 264 ¶ 74). They found his personal identification and his prescriptions in a dresser drawer in the living room on the first floor, and several bills in the house were addressed to Treadwell at the home's address. (Dkt. 243-3 at 153:112, 156:14–19; dkt. 264 ¶¶ 90, 92). They had plenty of evidence showing Treadwell lived there and suggesting he controlled the residence.

Though others stayed in the house as well, (dkt. 264 ¶ 41), no evidence showed anyone had exclusive access to any area of the house. (Dkt. 264 ¶¶ 38–39, 42–43). Nor is it clear whether officers knew at the time of the arrest that anyone other than Treadwell lived at the Harding residence. Even if they did, "if two or more persons share immediate and exclusive control [the area] or share the intention and power to exercise control [the area], then each has possession." *People v. Givens*, 934 N.E.2d 470, 486 (Ill. 2010) (quoting *People v. Schmalz*, 740 N.E.2d 775, 779 (Ill. 2000)). This all supports a reasonable, commonsense inference that Treadwell lived at the Harding residence and controlled all areas of the premises to the same extent as any other occupant.

This control also permits "an inference of knowledge and possession" of what was found there. *People v. Givens*, 934 N.E.2d 470, 484 (Ill. 2010); *People v. Adams*, 641 N.E.2d 514, 519 (Ill. 1994). Whether the State could prove all the elements of constructive possession beyond a reasonable doubt at trial on this evidence is unclear. But "probable cause is a lower bar." *Taylor*, 26 F.4th at 433; *see also Wesby*, 138 S. Ct. at 586 ("Probable cause is not a high bar." (internal quotations omitted)).

Treadwell argues that because Elizondo and Salgado "broke from established protocol" and entered the house before the rest of their team, they had time to move things around and make it look like they were recovered in places they were not. (Dkt. 266 at 14). Defendants did not take photographs at that time. (Dkt. 276 ¶¶ 55, 57). And there were no other witnesses to what Defendants did during the "five to seven minutes" they were alone in the house. (Dkt. 276 ¶ 55; dkt. 262-9 at 47:16–48:17). In other words, Treadwell argues they manufactured probable cause that otherwise would not have existed. Furthermore, Treadwell told the police before and during the search that he knew nothing about any contraband there. (Dkt. 243-8 at 156:21–157:1, 163:8–18, 204:4–6; dkt. 264 ¶ 91; dkt. 276 ¶ 51). When presented with the drugs and guns recovered, he said they were not his, though he did not say whose they were at that time or otherwise explain their presence. (Dkt. 243-8 at 160:25–162:14, 163:8–18, 165:17–166:2). Finally, Treadwell points to Defendants' exercise of their Fifth Amendment privilege when asked whether they framed Treadwell or manipulated evidence to make it look like Treadwell constructively possessed contraband. (Dkt. 276 ¶ 84).

These contentions strike the Court as speculative. *See FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion." (internal quotations omitted)). But even assuming

Defendants had time to find the guns, drugs, and Treadwell's personally identifying documents and relocate them to more incriminating places within the home in the five to seven minutes they were alone, this would not vitiate objective probable cause here. Regardless of precisely where the contraband was found within the home, there is no dispute that officers recovered all of it from the Harding residence. Nor is it disputed that Treadwell lived there, and officers had sufficient evidence to infer he controlled all areas of the residence. When arrested, Treadwell denied he knew about the contraband, but "[m]any putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established." *Young*, 987 F.3d at 644 (quoting *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999)). He identified no one else who purportedly owned the items or controlled the areas where they were found.

Treadwell relies on *Taylor v. Hughes*—where the court declined to find probable cause existed as a matter of law—to argue no probable cause exists here. But the facts of *Taylor* are distinguishable. In *Taylor*, officers executing an invalid search warrant on a confidential informant's tip expected to find a black .38 caliber pistol in Taylor's apartment. 26 F.4th at 432. But they found no such gun. *Id.* Instead, they found a "blue gun in an open safe in the apartment's second bedroom"—which they knew was *not* Taylor's bedroom, and which was occupied by two other adults and three children. *Id.* Although Taylor was not home when officers searched, and the bedroom where they found a different gun was occupied by other people, the district court still found probable cause existed for Taylor's constructive possession of the blue gun. *Id.* But the Seventh Circuit disagreed, because "there was no evidence linking [Taylor] to the location where the contraband was found—here, the second bedroom" when officers had proof Taylor resided in another bedroom. *Id.*

Here, Treadwell argues the facts are even more damning. Again, he relies on Elizondo's and Salgado's entry into the home before the other officers and the time they had to move items around to cast doubt on the officers' probable cause for Treadwell's constructive possession. But unlike in *Taylor*, Treadwell was home when the officers arrived. He was there to demonstrate control over the premises in various ways. Moreover, In *Taylor*, the court found it problematic that the recovered gun—which did not match the description of the gun they were looking for—was found in a safe in *someone else's bedroom*, while it was occupied by two other adults. *Id.* at 432–33. This would have suggested it was not Taylor's, because nothing linked Taylor to that bedroom or that gun. *Id.* Here, no one else was home, and no evidence showed that other occupants exercised exclusive control over any specific areas of the home. There was nothing to cast doubt on officers' inference of Treadwell's control over all rooms and all storage areas. Even if it is unclear precisely where the contraband was found, officers in this case had probable cause to believe Treadwell controlled the entire premises. Multiple officers recovered numerous items from throughout the house that was evidence of criminal activity. Treadwell did not tell officers someone else possessed those items, just that he knew nothing about them. From an objective viewpoint, probable cause existed to arrest Treadwell for possessing contraband located anywhere within the home.

Alternatively, even if insufficient information existed for probable cause to believe Treadwell constructively possessed the contraband through control of the precise locations where they were found, the officers had arguable probable cause to arrest on these facts. It is undisputed that evidence of criminality was recovered from Treadwell's home. A reasonable officer, finding weapons and suspected illicit drugs in any area of the house, could have believed the arrest of the home's sole occupant—who clearly lived there—lawful considering clearly established law. *See Taylor*, 26 F.4th at 433 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Just as the Seventh

Circuit ultimately concluded in *Taylor*, "[g]iven the broad language employed by some Illinois cases and the lack of a contrary case directly on point, . . . qualified immunity precludes liability." *Id.*

The Court emphasizes that it is extremely serious—and in fact, criminal—for police officers to manipulate evidence to incriminate someone. Such actions are intolerable from law enforcement. Defendant Officers are serving sentences in federal prison for proven misconduct they committed in other cases. Still, even if they committed the misconduct Treadwell alleges here by moving some items around to create a stronger case for his constructive possession, probable cause or at least arguable probable cause to arrest existed regardless of precisely where in the house officers may have found some of the contraband.

*b) Unlawful Pretrial Detention*

Treadwell further points to evidence that Defendants falsified his statements in their arrest reports, which led to him being detained prior to trial without probable cause. Even so, they had probable cause or arguable probable cause to arrest him, as explained above. *See Young*, 987 F.3d at 644 (holding that even if police falsified evidence against defendant after his arrest, they still had probable cause to detain based on circumstances of the arrest itself). Probable cause to arrest defeats a Fourth Amendment claim for unlawful pretrial detention. *Id.*; *see also Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019) (false arrest and false imprisonment claims failed based on probable cause to arrest).

In sum, both Treadwell's Fourth Amendment claims for unreasonable seizure fail. Defendant Officers are granted summary judgment on Counts II and III of Treadwell's complaint.

### 3. Due-Process Violation

The parties agree that under current Seventh Circuit caselaw, Treadwell's pretrial deprivation of liberty claim arises only under the Fourth Amendment and not under the Fourteenth Amendment. *See McWilliams v. City of Chicago*, 2022 WL 135428, at *2 (7th Cir. 2022). Treadwell concedes summary judgment on Count IV must be granted in favor of Defendants. (Dkt. 266 at 20). He contends that the Seventh Circuit has wrongly decided this issue and preserves this argument for appeal. (*Id.*)

### 4. Failure to Intervene

A police officer may be held liable under § 1983 for failing to intervene to prevent a known violation of another's constitutional rights. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). To succeed on a failure-to-intervene claim, a plaintiff must show "the Defendant(s) (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (citing *Yang*, 37 F.3d at 285). The question of whether an officer "had a realistic opportunity to prevent" the violation nearly always implicates questions of fact for the jury. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*." *Id.* (citing *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)).

Defendants move for summary judgment on Treadwell's failure-to-intervene claim solely on the basis that it derives "entirely from Plaintiff['s] Fourth Amendment claims pertaining to the search of his home, his arrest, and subsequent prosecution." (Dkt. 246 at 47). Because those claims

33

fail, they argue his failure-to-intervene claim fails. (*Id.*) But as discussed, Treadwell's illegal-search claim remains live. Thus, his failure-to-intervene claim survives as well. Defendant Officers are not entitled to summary judgment on Count V.

### 5. Federal Conspiracy

Treadwell next claims that the Defendant Officers conspired to violate his constitutional rights. He argues a reasonable jury could conclude Defendant Officers agreed to frame Treadwell for committing criminal acts, "starting as early as procuring a search warrant purportedly based on information from a source who they knew was a liar, continuing through a meeting pre-search followed by an actual search where they worked together to fabricate the scene, up through the creation of a police report that included a fabricated incriminatory statement that Elizondo claimed Mr. Treadwell." (Dkt. 266 at 21–22).

"To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022) (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). In other words, the plaintiff must " 'show an underlying constitutional violation' and 'demonstrate that the defendants agreed to inflict the constitutional harm.' " *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Hurt v. Wise*, 880 F.3d 831, 842 (7th Cir. 2018)). Furthermore, "[b]ecause conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Id.* (quoting *Beaman v. Freesmeyer*¸776 F.3d 500, 510 (7th Cir. 2015)).

As discussed, Treadwell's illegal-search claim remains live. This satisfies the underlying constitutional violation for now. Treadwell has also produced circumstantial evidence suggesting

that Elizondo and Salgado worked together to procure the flawed search warrant. First, Elizondo recruited Davis as a paid informant and gave Davis his own phone number. (Dkt. 264 ¶ 8; dkt. 276 ¶ 16). Davis then told Elizondo that "Mark" was selling drugs from his house and had two guns. (Dkt. 243-2 at 1428:24–1429:3). Elizondo sent Davis a photo of Mark Treadwell. (Dkt. 243-2 at 1428:18–22). Despite the unilateral communication between Elizondo and Davis until that point, Salgado wrote and swore out the search warrant complaint. (Dkt. 243-4 at 12–14). The warrant complaint then describes the purported communications between Davis (J. Doe) and Salgado. (*Id.*) Finally, after the search of Treadwell's house and his arrest, Elizondo paid Davis about $200. (Dkt. 243-2 at 1431:22–1432:3). Given this, it is reasonable to infer Elizondo and Salgado worked together to procure the warrant based on Davis's tip. Indeed, they could not have done otherwise— Salgado did not receive the tip directly from Davis, and Elizondo did not swear out the warrant himself. And if they both knew the search was not supported by probable cause but sought it anyway, a jury could also conclude that each took an overt act in furtherance of the conspiracy to violate Treadwell's Fourth Amendment rights.

Defendant Officers are denied summary judgment on Treadwell's federal conspiracy claim (Count VI).

### 6.    Supervisory Liability

Rounding out Treadwell's federal claims against the individual defendants, he contends Elizondo is liable as a supervisor for any violations of Treadwell's constitutional rights that Salgado committed. While there is no respondeat superior liability under § 1983, "[s]upervisory liability will be found if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (quoting *Lanigan v. Village of E. Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997)). So, "to be

liable for the conduct of subordinates, a supervisor must be personally involved in that conduct." *Id.* (quoting *Lanigan*, 110 F.3d at 477). Personal involvement means knowing about the conduct, and either facilitating, approving, condoning, or turning a blind eye to it. *Id.* (citing *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)).

It is undisputed that Elizondo supervised Salgado. (Dkt. 264 ¶ 3). As described above, Elizondo recruited Davis as a paid informant and communicated with him directly. There are disputed material facts as to whether Elizondo had developed probable cause to seek a search warrant for Treadwell's home based on the limited information Davis provided him. Elizondo had to work with Salgado for Salgado to procure the search warrant based on Davis's information. Elizondo was therefore "personally involved" in facilitating the search warrant. As Treadwell's illegal-search claim remains live, so too does his supervisory-liability claim.

Elizondo is denied summary judgment on Count VII of Treadwell's claim.

## B.    State-Law Claims

Treadwell brings claims under Illinois law for malicious prosecution (Count VIII), intentional infliction of emotional distress (Count IX), and civil conspiracy (Count XI) against the Defendant Officers. He also brings claims against the City of Chicago for respondeat superior (Count XI) and indemnification (Count XII), which depend upon the state-law claims against the individual defendants.

### 1.    Malicious Prosecution

To recover on a claim for malicious prosecution, a plaintiff must show: "(1) The commencement of or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the

plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The dismissal of criminal charges *nolle prosequi* is considered a termination in favor of the accused when it is consistent with an inference of the accused's innocence. *Id.* at 1242–43. A *nolle prosequi* dismissal would not be consistent with innocence when it is "the result of . . . the impossibility or impracticability of bringing the accused to trial." *Id.* at 1243. Further, the plaintiff bears the burden of proof that "the *nolle prosequi* was entered for reasons consistent with his innocence. . . . The circumstances surrounding the abandonment of criminal proceedings *must compel an inference* that there existed a lack of reasonable grounds to pursue the criminal prosecution. Otherwise, every time criminal charges are nol-prossed a civil malicious prosecution action could result." *Id.* (emphasis added).

Treadwell's malicious-prosecution claim against the Defendant Officers fail at both the second and third required element. First, he has not born his burden to show that the *nolle prosequi* was entered for reasons consistent with his innocence. Much like the Illinois Supreme Court found in *Swick v. Liautaud*—the seminal malicious-prosecution case in Illinois—the bare *nolle prosequi* order terminating Treadwell's case gave no reasons for its entry. *See id.* Treadwell asserts—without specificity, and only in a footnote—that "substantial evidence shows that Defendants fabricated the case against him, and so a reasonable jury could determine that the criminal charges were dismissed in a manner indicative of his innocence." (Dkt. 266 at 19 n.2). This underdeveloped argument is insufficient to carry his substantial burden. He points to no specific evidence showing why the *nolle prosequi* order was entered in a manner consistent with his innocence. *See Washington v. Summerville*, 127 F.3d 552, 558 (7th Cir. 1997) ("A bare nolle prose without more is not indicative of innocence. Lack of a recorded reason for the nolle prosequi offers no insight into the validity or invalidity of [plaintiff's] position . . . .").

At most, had Treadwell argued the point, he might have pointed to circumstantial evidence regarding the timing of the CCSAO's decision to nolle prose the charges, only five days after Elizondo and Salgado were indicted on federal charges. But these circumstances do not "*compel an inference* that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Swick*, 662 N.E.2d at 1243. At most, it permits several valid inferences, including the "impossibility or impracticability" of going to trial if key evidence of the alleged crimes were suppressed. *See, e.g.*, *El Ranchito, Inc. v. City of Harvey*, 207 F. Supp. 2d 814, 822–23 (N.D. Ill. 2002) (finding suppression of illegally obtained but reliable evidence not consistent with defendant's innocence); *Washington*, 127 F.3d at 558 (holding dismissal after state-court suppression of otherwise reliable, key evidence insufficient to show termination of charges consistent with innocence).

Even if the circumstances of this dismissal were sufficient to compel an inference of Treadwell's innocence to all charges brought against him—and neither the parties nor the Court has found a controlling case directly on point to show it would[8]—Treadwell's malicious-prosecution claim still fails on the next element: lack of probable cause to arrest for the charges brought against him. *See Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (holding that under *Swick v. Liautaud*, the existence of probable cause is a "complete defense" to an Illinois malicious-prosecution claim). As discussed, the Court has found probable cause existed to arrest Treadwell for unlawful possession of the items recovered in the search of his house. He was then criminally charged for the same. Even if these items were recovered because of an illegal search, probable

---

[8] Treadwell cites *Thompson v. Clark*, 142 S. Ct. 1332, 1335 (2022), for the proposition that "to demonstrate a favorable termination of a criminal prosecution . . . a plaintiff need only show that his prosecution ended without a conviction." (*See* dkt. 266 at 19). But Treadwell has not brought a federal claim under the Fourth Amendment and § 1983 for malicious prosecution, which was the basis for the *Thompson* holding. 142 S. Ct. at 1335 "[Plaintiff] advanced a Fourth Amendment claim under 42 U.S.C. § 1983 for malicious prosecution."). Treadwell included only an Illinois state-law claim, and thus it must be analyzed under controlling precedent of the Illinois Supreme Court and the Seventh Circuit's application of relevant controlling Illinois law. The federal standard articulated in *Thompson* is inapplicable.

cause to arrest and charge the alleged crimes still bars the malicious-prosecution claim. *See, e.g.*, *McWilliams v. City of Chicago*, No. 20-1770, 2022 WL 135428, at *3 (despite illegal search, probable cause to arrest and charge for possession of brass knuckles precluded malicious-prosecution claim).

Defendant Officers are thus granted summary judgment on Count XIII of Treadwell's claim.

### 2.    Intentional Infliction of Emotional Distress

Illinois follows the Restatement (Second) of Torts, § 46 (1965), for claims of intentional infliction of emotional distress ("IIED"). *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To recover, the plaintiff must prove (1) defendant's conduct was "truly extreme and outrageous;" (2) the defendant intended either "that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress;" and (3) that the conduct in fact caused *severe* emotional distress. *Id.* (citing *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976) (emphasis in original)). The plaintiff's emotional distress "must be so severe that no reasonable person could be expected to endure it." *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. 1997).

Treadwell explains his IIED claim stems from his claims that "Defendants secured an illegal warrant under false pretenses and then framed Plaintiff for crimes he did not commit. That is more than sufficient for an IIED claim." (Dkt. 266 at 23). Plaintiffs cite only *Serrano v. Guevara*, No. 17 CV 2869 and No. 17 CV 4560, 2020 WL 3000284, at *21 (N.D. Ill. June 4, 2020), for the proposition that "[f]abricating and manufacturing evidence and concealing exculpatory evidence, 'for the purpose of falsely and maliciously detaining, arresting, and charging plaintiffs, knowing that such charges lacked probable cause' constitutes extreme and outrageous conduct." (quoting *Bianchi v. McQueen*, 405 Ill. Dec. 419, 439 (2nd Dist. 2016)). But again, the Court has found that

Defendants had probable cause to arrest and charge Treadwell for unlawful possession of the items recovered from his house. This defeats his malicious-prosecution claim, and by extension, any IIED claim tied to his arrest and pretrial detention on those charges.

Whether he has a valid claim for IIED stemming *solely* from the search of his home—if that search was unsupported by probable cause—is a separate question. Neither the parties nor the Court has found a case where the plaintiff's distress arising from an illegal search gave rise to an IIED claim under Illinois law. But the Court need not address this issue. Treadwell has provided no evidence that he actually suffered severe emotional distress as a result of the alleged illegal search. Rather, the only evidence of suffering any emotional distress came from his testimony that he experienced trauma and sexual violence while housed at the Cook County Jail. (Dkt. 276 ¶ 72). But if this occurred, it was caused not by Defendants, but by other inmates in jail. Treadwell does not allege Defendants played any role in what happened after he was jailed on the unlawful-possession charges, which again, were supported by probable cause. And Defendants had no reason to know that he would experience these events because of their purported illegal search. On this record, Treadwell has failed to come forward with sufficient evidence that a reasonable jury could hold Defendants liable for intentional infliction of emotional distress based on an illegal search.

The Court grants Defendants summary judgment on Count IX of Treadwell's claims.

### 3. Civil Conspiracy

Under Illinois law, civil conspiracy is "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quoting *Buckner v. Atl. Plant Maintenance, Inc.*, 182 Ill.2d 12, 23 (1998)). To prevail on a claim

for conspiracy, "a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but that such act was tortious or unlawful in character." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). "Once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy." *Id.* at 894–95. Conspiracy, however, is not an independent tort, and if "a plaintiff fails to state an independent cause of action underlying [the] conspiracy allegations, the claim for conspiracy also fails." *Merrilees v. Merrilees*, 998 N.E.2d 147, 162 (Ill. App. Ct. 2013) (quoting *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill.App.3d 416, 432 (2000)).

Here, Treadwell alleges the Defendant Officers conspired to procure a search warrant in violation of the Fourth Amendment. As described above in his federal conspiracy claim, he has shown sufficient circumstantial evidence exists to infer an agreement between the Defendant Officers to take these actions. Treadwell's federal claim that such conduct led to the illegal search of his house survives summary judgment. But Treadwell has not argued how this conduct—on its own—constitutes an independent cause of action under Illinois law. He alleged only in his complaint that Defendants "jointly acted and/or conspired among and between themselves to falsely imprison Mr. Treadwell and/or to continue that imprisonment, to maliciously prosecute Mr. Treadwell and/or continue that prosecution, and to intentionally inflict severe emotional distress on Plaintiff." (Dkt. 99 ¶ 125). But as discussed, the malicious prosecution and IIED claims fail at summary judgment. His Brief in Opposition to Summary Judgment fails to describe how the actions Defendant Officers took to secure the search warrant violated Illinois law. As an underlying cause of action is necessary for an Illinois civil-conspiracy claim, Treadwell has forfeited this potential claim as it pertains to an illegal search under Illinois law. *See Nichols v. Mich. City Plant*

*Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

The Court grants Defendants summary judgment on Count X of Treadwell's claims.

**4.      Respondeat Superior and Indemnification Claims Against the City of Chicago**

Defendant City of Chicago joined the Defendant Officers' Motion for Summary Judgment, arguing that Treadwell's respondeat superior and indemnification claims will fail as a matter of law if Defendants prevail on their Motion as to the state-law claims. (Dkt. 247). Plaintiff filed no briefing to oppose the City's Motion. The Court, finding all claims under Illinois law fail against the Defendant Officers, agrees that the state-law claims also fail against the City.

The Court grants the City of Chicago summary judgment on Counts XI and XII of Treadwell's claims.

**CONCLUSION**

In sum, the Court denies the Defendant Officers summary judgment on Counts I, V, and VI of Treadwell's claims, and denies Defendant Elizondo summary judgment on Count VII. The Court grants the Defendant Officers summary judgment on Counts II, III, IV, VIII, IX, and X. The Court further grants Defendant City of Chicago summary judgment on Counts XI and XII.

Virginia M. Kendall
United States District Judge

Date: December 19, 2022